[No. G004410. Fourth Dist., Div. Three. Mar. 23, 1987.]

KENNETH TRUESDALE, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, DON LOGAN et al., Respondents.

COUNSEL

Baziak & Winters and Ronald S. Winters for Petitioner.

Richard W. Younkin, William B. Donohoe, Alvin R. Barrett, Charles E. Finster, Ufkes & Bright, Alvin J. Ufkes, John H. F. Ufkes and Faith Mitchell for Respondents.

OPINION

CROSBY, J.—Licensed cosmetologist Kenneth Truesdale, who had undergone one laminectomy in 1977, reinjured his lower back in November 1983 allegedly while lifting a five-gallon bottle of water at Spectrum Plus, the beauty shop where he worked. He subsequently underwent a second laminectomy.

Claiming Truesdale was an independent contractor, the corporate owner of Spectrum Plus denied he was entitled to workers' compensation benefits. The workers' compensation judge agreed, and in a split decision the Workers' Compensation Appeals Board denied Truesdale's petition for reconsideration. We annul the order. Notwithstanding the factual findings of the workers' compensation judge, the record discloses Truesdale's status was that of an employee as a matter of law.

I

The undisputed evidence was as follows: Truesdale, who had owned his own shop for fifteen years, began working at Spectrum Plus in late 1982. In early 1983, USA Industries purchased the shop. Don Logan, the majority shareholder, presented Truesdale with an "independent contractor" agreement prepared by his attorney. It provided Truesdale would be paid 65 percent of the revenues received by the shop for his work and for severance of the relationship without reason by either party upon 15 days' written notice. The contract was offered and received in evidence.

Truesdale paid no rent for his chair and apparently did not collect the fees from his customers directly. He was paid weekly by check. Nothing was with-

held for taxes, social security, or unemployment. His hours were from nine to five with time for lunch. He would see seven to eight clients a day who would tip him two dollars on the average. While he furnished his own tools, e.g., scissors and hand-held hair dryers, the shop supplied the furniture, fixed hair dryers, towels, and shampoo and other consumable hair products, as well as business cards for all the cosmetologists. It also provided brushes and lotions for retail sale to customers, and Truesdale was paid a separate commission for those transactions.

In addition to the undisputed evidence, the conflicting evidence described below was offered. As the alleged employer's version of this evidence was adopted by the judge, we accept his findings in the resolution of the issue presented.

According to Truesdale, he became manager of the shop in August 1983 by an oral arrangement. He was responsible for opening and closing, hiring personnel, and ordering supplies. He presented a business card in evidence bearing the logo of Spectrum Plus and describing him as the manager. Truesdale was supposed to receive an extra five percent for his added duties. But the shop did not do well, and Truesdale was never paid the bonus. His injury occurred, he claimed, when this supplemental agreement was in force.

The shop's manicurist testified she answered a newspaper advertisement and was hired by Truesdale, who identified himself as the manager. She considered him her supervisor. She had never met the owners or anyone else identified as a manager.

USA Industries' accountant testified to the contrary. He claimed *he* was the shop manager. He concededly had no beauty shop experience, however; and he never told the operators how to work, except that someone was required to be on the premises at all times during business hours. According to him, even the receptionist was not an employee but an independent contractor. He could not recall how she was paid. She was called as a witness, but the workers' compensation judge would not permit her to testify because she was hired after Truesdale was injured. ██ ██ ██▀██ There was an offer of proof that she received an hourly wage of $3.35.[1]

---

[1] The workers' compensation judge clearly erred in excluding the testimony of the receptionist. Her proposed testimony did not lack relevance merely because she was hired after Truesdale's injury. Based on the offer of proof, she was rather obviously an employee and would have tended to impeach the alleged employer's accountant on a material issue and show the independent contractor arrangement was merely an ongoing subterfuge to avoid the shop's responsibilities to its employees and the tax collector. It would also have disclosed a habit and custom to label any worker, regardless of position or relationship to the owner, as an independent contractor. (See Evid. Code, § 1105.) A refusal to allow the presentation of relevant evidence is, of course, an appropriate basis to annul a decision of the board. (*Gill* v. *Workers' Comp. Appeals Bd.* (1985) 167 Cal.App.3d 306, 310 [213 Cal.Rptr. 140].) We need not consider whether this error would alone require the order to be annulled in light of our disposition on the merits.

The workers' compensation judge disbelieved Truesdale's claim that he was the manager. He determined the agreement between Truesdale and USA Industries evidenced "the parties' intention [ ] to create a ... relationship of independent contractor" and concluded Truesdale did "not [meet] the burden of proof he is an employee." Over a dissent, two members of the board agreed with the workers' compensation judge and denied the petition for reconsideration.

## II

The only evidence presented on the question to date has established that Truesdale was injured on the job. But the workers' compensation judge concluded his "Opinion of Judge on Decision" as follows: "Since the applicant has not met the burden of proof he is an employee, the other issues are moot." This was erroneous. It was the alleged employer's burden to establish Truesdale was an independent contractor and not an employee. Labor Code section 5705 provides in part, "The burden of proof rests upon the party holding the affirmative of the issue. The following are affirmative defenses, and the burden of proof rests upon the employer to establish them: [¶] (a) That an injured person claiming to be an employee was an independent contractor or otherwise excluded from the protection of this division where there is proof that the injured person was at the time of his injury actually performing service for the alleged employer."

This error, although not explicitly repeated, was not corrected in the Report and Recommendation of Workers' Compensation Judge on Petition for Reconsideration; and we must assume he continued to view the evidence in light of that misconception. The report was adopted by a majority of the board without any suggestion that it viewed the burden of proof any differently; the decision merely notes the judge's determination was supported by substantial evidence. Although not specifically raised in Truesdale's petition, the misallocation of the burden of proof perhaps explains the board's error on the merits.

We may only answer the question of whether Truesdale was an employee or independent contractor if his status is established as a matter of law in light of the board's factual findings. And we recognize the nature of such relationships is generally a factual one for the board. (*Germann* v. *Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 776, 782 [176 Cal.Rptr. 868].) Nevertheless, where the facts would support but one conclusion, the issue is a legal one and a contrary finding by the board is not sustainable. (*Perguica* v. *Ind. Acc. Com.* (1947) 29 Cal.2d 857, 859 [179 Cal.Rptr. 812]; *Mission Ins. Co.* v. *Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 211,

219 [176 Cal.Rptr. 439]; *Germann* v. *Workers' Comp. Appeals Bd., supra,* at p. 783.)

■ Truesdale admitted signing the agreement which purported to give him independent contractor status; but that document, of course, is not necessarily dispositive of the issue, even in the absence of fraud or mistake. (*Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 952 [88 Cal.Rptr. 175, 471 P.2d 975]; *Burlingham* v. *Gray* (1943) 22 Cal.2d 87 [137 P.2d 9]; Cal. Workers' Compensation Practice (Cont.Ed.Bar 1985) § 3.16, p. 78.) ■ The workers' compensation system cannot be avoided by direct contract, and subterfuges designed to avoid the workers' compensation laws are not countenanced. (See, e.g., *Bemis* v. *People* (1952) 109 Cal.App.2d 253 [240 P.2d 638].) ■ In short, "[t]he contract cannot affect the true relationship of the parties to it. Nor can it place an employee in a different position from that which he actually held." (*Martin* v. *Phillips Petroleum Co.* (1974) 42 Cal.App.3d 916, 919 [117 Cal.Rptr. 269]; see also *Kowalski* v. *Shell Oil Co.* (1979) 23 Cal.3d 168, 176 [151 Cal.Rptr. 671, 588 P.2d 811].)

■ Moreover, the alleged employer's insistent reliance on the language of the so-called independent contractor agreement can be turned against him; for, as the board and the litigants have failed to note, it erroneously defines the term "independent contractor" by describing the exact opposite: " 'Independent Contractor' means any person who renders service for a specified recompense for a specific result, under the control of his principal as to the means by which such result is accomplished." The definition purports to quote Labor Code section 3353; but that section actually reads, with the differences emphasized, as follows: " 'Independent contractor' means any person who renders service for a specified recompense for a specified result, under the control of his principal *as to the result of his work only and not as to the means by which such result is accomplished.*" Thus, a literal reading of the mistranscribed document prepared by the alleged employer's attorney, which Truesdale was required to sign and which we are urged to accept as *the* description of the relationship between them, provided his labor was subject to control in the manner of an employee.

■ As our Supreme Court has frequently stated, "The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. [Citation.]" (*Tieberg* v. *Unemployment Ins. App. Bd., supra,* 2 Cal.3d at p. 946; *Empire Star Mines Co.* v. *Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43 [168 P.2d 686], disapproved on another point in *People* v. *Sims* (1982) 32 Cal.3d 468, 479 , fn. 8 [186 Cal.Rptr. 77, 651 P.2d 321].) This agreement states the alleged employer has that control.

█ The alleged employer also suggests the nature of the cosmetology profession does not lend itself to an employer-employee relationship because it is the customer and not the owner of the premises who controls the creation of the coiffure. The argument is unpersuasive. Caddies at a golf course are similarly situated. They are subject to the control of golfers and not management when performing their services, yet they have been held to be employees of the club. (*Claremont C. Club* v. *Industrial Acc. Com.* (1917) 174 Cal. 395 [163 P. 209].) The Supreme Court explained, "The employment and discharge of the caddy during all of the time when he is not actually in the service of a member is wholly under the control of the country club, and this is the determinative fact in the matter." (*Id.,* at p. 398.) The same is obviously true of waiters, wash room attendants, and a host of other occupations, including ships' pilots; television script writers; professional jockeys; itinerant tree trimmers; domestic servants provided to the aged, blind, and disabled under government programs; and cleaning ladies—all of whom have been held to be employees, although all exercise similar freedom in the application of their skills to the task at hand. (*Societa per Azioni de Navigazione Italia* v. *City of Los Angeles* (1982) 31 Cal.3d 446 [183 Cal.Rptr. 51]; *Tieberg* v. *Unemployment Ins. App. Bd., supra,* 2 Cal.3d 943 ; *Isenberg* v. *California Emp. Stab. Com.* (1947) 30 Cal.2d 34 [180 P.2d 11]; *Guzman* v. *Workers' Compensation Appeals Bd.* (1984) 158 Cal.App.3d 190 [204 Cal.Rptr. 527]; *In-Home Supportive Services* v. *Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720 [199 Cal.Rptr. 697]; *Johnson* v. *Workmen's Comp. Appeals Bd.* (1974) 41 Cal.App. 3d 318 [115 Cal.Rptr. 871].)

█ Since the so-called independent contractor agreement and the cosmetologist-client relationship do not persuade us of the correctness of the board's holding, we turn to the other appropriate tests described in the seminal case on the subject, *Empire Star Mines Co.* v. *Cal. Emp. Com., supra,* 28 Cal.2d 33 : "Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Id.,* at pp. 43-44.)

█ A review of our facts against the applicable criteria confirms the

employment relationship in this case. The first is of considerable significance. Truesdale was obviously engaged in the same occupation as his principal, the dispensation of beauty services. This is a very strong indication of the existence of an employment relationship. Members of an assembly line could not be considered independent contractors. The workers in a beauty shop are not much different. They are employed in the business of beautifying the clientele who pass through their stations, often to be attended by other workers such as shampooers and manicurists.[2]

Although Truesdale's occupation involves the exercise of skill, we do not find it to exceed that required of a harbor pilot, professional jockey, television script writer, or tree trimmer. All require a certain expertise, as would physicians in the employ of a health maintenance organization; but all are employees nonetheless. In this instance the applicant supplied some of his own tools; but the alleged employer provided the place of work, accoutrements of the profession, business cards, and many of the products essential to the trade. Compared to a television script writer with his own typewriter, a jockey with his own saddle, or a tree trimmer with his own saw, Truesdale's status appears closer to the employee side of the line on this point. We also note in passing that Truesdale's injury did not occur in the process of applying his skill, but in an activity that benefited the business itself, lifting a water bottle.

Another particularly telling factor is the duration of the period for which Truesdale's services were to be performed. He was terminable at will on 15 days notice, an earmark of an employment relationship inconsistent with the engagement of an independent contractor to complete a particular task. Also, he did not contract to perform each specific job separately, as generally do jockeys, tree trimmers, harbor pilots, and script writers — employees all. His relationship was open-ended and even more like that of an employee; he was to be available to the clientele which might appear.

He was paid for each performance of his services on a percentage basis and also received commissions on the sale of the shop's products. In this respect, he resembled an industrial piece worker and a sales clerk, obviously employees, as opposed to an independent contractor who might be engaged for the performance of a single task. Also, he was not paid directly by his clients, but indirectly via a weekly lump sum paycheck in the manner of employees generally.

---

[2]There was no evidence presented as to the local custom in the business, i.e., whether most cosmetologists purport to work as independent contractors or as employees; thus, we do not consider that factor either way.

Finally, as to the beliefs of the parties, we find little to support a finding either way. Because of the botched definition of independent contractor, the written agreement was more than equivocal despite its obvious purpose. Moreover, we do not find this consideration to be controlling even if, as the workers' compensation judge found, the parties thought they had created an independent contractor arrangement. The beliefs of the parties could only be of significance in a marginal case. The reality of the relationship, not the parties' understanding, is of primary importance.

Thus, we conclude there was no evidence, apart from the description of the agreement Truesdale signed and the failure of his employer to withhold taxes from his checks, to indicate he was anything but an employee. Instead of rent or percentage of his earnings in exchange for a place to work, he received a fixed commission from the alleged employer for services rendered and commissions for retail sales in the form of a weekly paycheck. He was terminable at will and without cause on 15 days' written notice. Although he provided some tools of his own, the shop furnished, at no cost to him, the major accoutrements of his trade: chairs, sinks, dryers, shampoos and conditioners, and towels and drop sheets. Finally, "someone" was required to be present on the premises during business hours; and that person was, apparently, Truesdale.

We reject the label placed on this relationship by the parties and accepted by the board. Truesdale was an independent contractor in name only. Notwithstanding the contract designation, the literal language of that document and the objective evidence established, as a matter of law, his status as an employee.

Moreover, this determination squares with the public policy of this state, a factor emphasized in more recent cases on the subject: "In this respect, it would appear that rather than relying merely upon the specific and several tests listed in *Tieberg* and *Empire Star,* we should also consider (a) the purpose of the statute and the intention of the Legislature, (b) the persons sought to be protected, (c) if the petitioner is or is not of a class of persons generally intended to be protected, (d) whether there are any other specific statutory exclusions, and (e) what are the relative bargaining positions of the parties mentally, economically and educationally." (*Johnson* v. *Workmen's Comp. Appeals Bd., supra,* 41 Cal.App.3d 318, 322 ; see also *Germann* v. *Workers' Comp. Appeals Bd., supra,* 123 Cal.App.3d 776, 784.) Persons such as Truesdale, who perform services for the public and engage in retail sales in specialized shops operated by others, are certainly within the class of persons the legislative scheme was meant to protect; and there are no applicable statutory exclusions. Truesdale had little or no bargaining position; he

was simply required to sign the so-called independent contractor agreement prepared by the alleged employer's attorney. There were no negotiations, no options.

Accordingly, the board's order denying reconsideration is annulled and the matter is remanded for further proceedings consistent with this opinion.

Trotter, P. J., and Sonenshine, J., concurred.

A petition for a rehearing was denied April 14, 1987, and the opinion was modified to read as printed above. The petition of respondents Logan, Spectrum Plus and USA Industries for review by the Supreme Court was denied June 17, 1987.